PASHMAN STEIN, P.C.
MICHAEL S. STEIN
JOHN T. WHIPPLE
SEAN MACK
Court Plaza South
21 Main Street, Suite 100
Hackensack, NJ  07601
Telephone:  201/488-8200
201/488-5556 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARK S. REICH
CHRISTOPHER M. BARRETT
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROBERT DUVALL, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. _____ |
| Plaintiff, | ) ) | PLAINTIFF'S CLASS ACTION COMPLAINT FOR BREACH OF |
| vs. | ) ) ) | FIDUCIARY DUTIES AND VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| PAR PHARMACEUTICAL COMPANIES, INC., PETER S. KNIGHT, PATRICK G. LEPORE, RONALD M. NORDMANN, THOMAS P. RICE, MELVIN SHAROKY, JOSEPH E. SMITH, PATRICK J. ZENNER, TPG CAPITAL, L.P., SKY GROWTH HOLDINGS CORPORATION, and SKY GROWTH ACQUISITION CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiff, by his counsel, individually and on behalf of all others similarly situated, respectfully brings this class action for breach of fiduciary duty and violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder against the herein named defendants and alleges the following:

## NATURE OF THE ACTION

1.      Plaintiff brings this shareholder class action individually and on behalf of the other public shareholders of Par Pharmaceutical Companies, Inc. ("Par Pharma" or the "Company"), against Par Pharma, the Company's Board of Directors (the "Board" or the "Individual Defendants"), TPG Capital, L.P. ("TPG Parent"), Sky Growth Holdings Corporation ("Sky Growth"), and Sky Growth Acquisition Corporation ("Acquisition Sub") (TPG Parent, Sky Growth, and Acquisition Sub are collectively referred to herein as "TPG") in connection with the proposed sale of Par Pharma to TPG for merger consideration of $50 per share in cash (the "Proposed Transaction").  The Proposed Transaction is valued at approximately $1.84 billion.  This matter arises out of defendants' dissemination of a false and misleading proxy statement in violation of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, and the Board members' breaches of their fiduciary duties owed to the Company's stockholders under state law.

2.      Par Pharma is a U.S.-based specialty pharmaceutical company.  Through its wholly-owned subsidiary's two operating divisions, Par Pharmaceutical and Strativa Pharmaceuticals, it develops, manufactures and markets high-barrier-to-entry generic drugs and niche, innovative proprietary pharmaceuticals.

3.      On July 16, 2012, Par Pharma and TPG announced that the companies signed a definitive agreement pursuant to which TPG will acquire Par Pharma for consideration of $50 per

share in cash ("Merger Agreement").  Upon the terms of the agreement, Acquisition Sub will merge with and into Par Pharma with Par Pharma surviving as a wholly-owned subsidiary of Sky Growth.

4.      The Proposed Transaction was unanimously approved by the Board.

5.      In connection with the Proposed Transaction, however, the Board failed to adequately discharge its fiduciary duties to the shareholders by, *inter alia:* (i) failing to ensure that common shareholders will receive maximum value for their shares; (ii) failing to conduct an appropriate sale process; (iii) agreeing to preclusive deal-protection measures; and (iv) hiring a conflicted investment bank to advise the Company in connection with the Proposed Transaction.

6.      Although the Merger Agreement allows for a 39 day "go-shop" period, the provision is illusory.  First, the go-shop period is not nearly long enough for an adequate market check.  Second, the deal includes protective measures that individually and, worse, collectively were designed to strongly discourage competing bidders.  These preclusive deal protection devices include:

(a)      a "no-solicitation" provision that precludes Par Pharma, on and after July 4, 2012, from providing confidential Company information to (or even communicating with) potential competing bidders for the Company except under very limited circumstances;

(b)      an illusory "fiduciary out" for the no-shop provision that requires the Company to provide TPG with ***advance notice*** before providing any competing bidder with any confidential Company information, even after the Board has determined that the competing bid is reasonably likely to lead to a superior proposal and that the Board is breaching its fiduciary duties by not providing the competing bidder with confidential Company information;

(c)      an "information rights" provision that requires the Company to provide TPG with confidential, ***non-public information about competing proposals which TPG can then use to formulate a matching bid;***

(d)      a "matching rights" provision that requires Par Pharma to provide TPG with the **opportunity to match** any competing proposal; and

(e)      a "termination fee" provision that requires Par Pharma to pay TPG $24 million if the Proposed Transaction is terminated in favor of a superior proposal made during the go-shop period, and $48 million if the Proposed Transaction is terminated in favor of a superior proposal made during the no-shop period.

7.      Any potential competing bidder would be strongly discouraged by the deal protection devices, which give TPG access to confidential information about a potential competing bid and the unlimited right to respond to a competitive bid.  What is more, to acquire Par Pharma, a "go-shop" competitive bidder would have to assume the cost of the $24 million (or ≈$.60 per share) termination fee; for a bidder after the "go-shop," the termination fee would add $48 million (or ≈$.1.20 per share) to the cost of acquiring Par Pharma.

8.      In an attempt to secure shareholder support for the unfair Proposed Transaction, on August 2, 2012, defendants issued a materially false and misleading Preliminary Proxy on Schedule 14A (the "Proxy").  The Proxy, which recommends that Par Pharma shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information about the unfair sales process for the Company, conflicts of interest that corrupted the sales process, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company on a stand-alone basis and as a merger partner for TPG.  Specifically, the Proxy omits and/or misrepresents the material information detailed *infra* in ¶¶86-124, in contravention of §§14(a) and 20(a) of the Exchange Act and/or defendants' fiduciary duty of disclosure under state law.

9.      As explained herein, this information is material to the impending decision of Par Pharma's shareholders whether or not to vote in favor of the Proposed Transaction.  As such, defendants' violations of §§14(a) and 20(a) and their breaches of fiduciary duty under state law to

maximize shareholder value and disclose all material information in connection with a merger transaction threaten shareholders with irreparable harm for which money damages are not an adequate alternate remedy.  Thus, Plaintiff seeks injunctive relief to ensure that defendants cure their breaches of fiduciary duty and violations of §§14(a) and 20(a) before Par Pharma shareholders are asked to vote on the Proposed Transaction, and to ensure that defendants are not permitted to seek shareholder support of the Proposed Transaction without complying with their duty under state law to maximize shareholder value and the federal securities laws and state law to provide shareholders with all material information about the sales process, potential and actual conflicts of interest, the merger consideration, and the Company's intrinsic value.

10.     In sum, by agreeing to the Proposed Transaction, each of the defendants has breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or has aided and abetted such breaches.  Rather than acting in the best interests of the Company's shareholders, defendants tailored the terms of the Proposed Transaction to enhance their own personal benefit and to meet the specific needs of TPG; efforts which will ultimately eliminate the equity interest of Par Pharma's public shareholders.

11.     In essence, the Proposed Transaction is the product of a flawed process that was designed to make certain that the merger of Par Pharma with TPG was effectuated on terms preferential to TPG and defendants, and detrimental to Plaintiff and Par Pharma's shareholders.

12.     Accordingly, this action seeks equitable relief compelling the Board to properly exercise its fiduciary duties to the shareholders and to enjoin the close of the Proposed Transaction, presently scheduled to close by the end of the year.

### JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act for violations of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9

promulgated thereunder.  The Court also has jurisdiction over this action pursuant to 15 U.S.C. §78bb(f)(3)(A)(i), because it is a class action based on the statutory or common law of Delaware, defendant Par Pharma's state of incorporation, and thus may be maintained in federal court.  This Court has supplemental jurisdiction under 28 U.S.C. §1367.

14.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Par Pharma's headquarters are located at 300 Tice Boulevard, Woodcliff Lake, New Jersey and defendants include an officer and/or director who resides in New Jersey.

**THE PARTIES**

16.     Plaintiff Robert Duvall is, and all times relevant hereto was, the owner of Par Pharma common stock.

17.     Defendant Par Pharma is a Delaware corporation with its headquarters in Woodcliff Lake, New Jersey.  Par Pharma, together with its subsidiaries, engages in developing, licensing, manufacturing, marketing, and distributing generic and branded products primarily in the United States.  Its common stock is listed on the New York Stock Exchange under the symbol "PRX."

18.     Defendant Patrick G. LePore ("LePore") has been Chairman of the Company's Board since August 2007 and has served as Chief Executive Officer ("CEO") and President of Par Pharma since September 2006 and a director since May 2006.  From 2002 to 2005, LePore was President of the healthcare marketing group at Cardinal Health, Inc.  Defendant LePore is a resident of the State of New York.

19.     Defendant Joseph E. Smith ("Smith") has been the Lead Director of the Board since August 2007.   Smith was the Corporate Executive Vice President of Warner-Lambert Co. Defendant Smith is a resident of the State of Florida.

20.     Defendant Peter S. Knight ("Knight") has been a member of the Board since June 2004.  He was President of Omniken, an advisor to technology company CEOs, and he serves on several private and venture-funded company boards.  Defendant Knight is a resident of the State of New York.

21.     Defendant Ronald M. Nordmann ("Nordmann") has been a member of the Board since June 2004, and has been Co-President of Global Health Associates, LLC, a provider of consulting services to the pharmaceutical and financial services industries, since October 2000. Defendant Nordmann is a resident of the State of Florida.

22.     Defendant Thomas P. Rice ("Rice") has been a member of the Board since June 2009 and has been a principal of Columbia Investments LLC, a company he co-founded that invests in local businesses in Maryland, since 2007.  He was the CEO of Andrx Corporation from February 2004 to November 2006, when Andrx was sold to Watson Pharmaceuticals.  Defendant Rice is a resident of the State of Maryland.

23.     Defendant Melvin Sharoky, MD ("Sharoky") has been a member of the Board since March 2007 and was President and CEO of Somerset Pharmaceuticals, Inc., a research and development pharmaceutical company that markets Eldepryl for the treatment of patients with late-stage Parkinson's Disease and Emsam for major depressive disorder, from January 2002 to March 2007.  Defendant Sharoky is a resident of the State of Florida.

24.     Defendant Patrick J. Zenner ("Zenner") has been a member of the Board since July 2012.  Zenner retired in January 2001 from Hoffmann-La Roche Inc., North America, where he

served as President and CEO since 1993.  Zenner held various executive positions during his 32-year career with Hoffmann-LaRoche.  Defendant Zenner is a resident of the State of New Jersey.

25.     Defendants LePore, Smith, Knight, Nordmann, Rice, Sharoky, and Zenner are collectively referred to herein as the "Individual Defendants."

26.     The Individual Defendants, as officers and/or directors of Par Pharma, have a fiduciary responsibility to Plaintiff and the other public shareholders of Par Pharma, and owe them the highest obligations of good faith, loyalty, fair dealing, due care, and candor.

27.     Defendant TPG Parent is a private equity firm founded in 1992, with headquarters in San Francisco and Fort Worth, which invests in financial services, media, health care, retail, and other industries.  The firm has approximately $48 billion under management.  TPG Parent is sued herein as an aider and abettor.

28.     Defendant Sky Growth is a Delaware corporation formed on July 12, 2012.  Sky Growth is an affiliate of and controlled by TPG Parent.  Sky Growth is sued herein as an aider and abettor.

29.     Defendant Acquisition Sub is a Delaware Corporation formed on July 12, 2012 solely for the purpose of engaging in the Proposed Transaction.  Acquisition Sub is a direct, wholly-owned subsidiary of Sky Growth.  Acquisition Sub is sued herein as an aider and abettor.

30.     The Individual Defendants, together with Defendants Par Pharma, TPG Capital, SkyGrowth, and Acquisition Sub, are referred to herein collectively as "Defendants."

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all public holders of Par Pharma common stock who are being and will be harmed by defendants' actions described below (the "Class").  Excluded from the Class

are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

32.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

33.     The Class is so numerous that joinder of all members is impracticable.  According to Par Pharma's SEC filings, as of June 30, 2012, there were 39,989,734 shares of Par Pharma common stock outstanding.

34.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     whether defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction, and/or are aiding and abetting therein;

(b)     whether defendants are engaging in self-dealing in connection with the Proposed Transaction, and/or are aiding and abetting therein;

(c)     whether defendants have breached their fiduciary duty to secure and obtain the best value reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction, and/or are aiding and abetting therein;

(d)     whether defendants are unjustly enriching themselves and other insiders or affiliates of Par Pharma and/or TPG, and/or are aiding and abetting therein;

(e)     whether defendants have breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, candor and fair dealing, and/or are aiding and abetting therein;

(f)      whether defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets, and/or have aided and abetted therein;

(g)      whether the Proposed Transaction compensation payable to Plaintiff and the Class is unfair and inadequate; and

(h)      whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

35.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

36.     Plaintiff is an adequate representatives of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

37.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

38.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

39.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

40.     By reason of their positions as officers and/or directors of the Company, the Individual Defendants are in a fiduciary relationship with Plaintiff and the Company's other public

shareholders, and owe them the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure.

41.     In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-up of the corporation's assets, they have a fiduciary obligation to act in the best interests of the company's shareholders.  To diligently comply with these duties, the directors may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to acquire control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties; and/or

(d)     will provide the directors, executives or other insiders with preferential treatment at the expense of, or separate from, the public shareholders, or place their own pecuniary interests above those of the interests of the company and its shareholders.

42.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Par Pharma, are obligated to:

(a)     determine whether a proposed sale of the Company is in the shareholders' best interests;

(b)     consider all *bonafide* offers or strategic alternatives; and

(c)     refrain from implementing unreasonable measures designed to protect a transaction to the exclusion of a more beneficial deal, and from participating in any transaction in which their loyalties are divided.

43.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, have violated and are continuing to violate the fiduciary

duties they owe to Plaintiff and the Company's other public shareholders, including the duties of loyalty, good faith, candor, and due care.

## SUBSTANTIVE ALLEGATIONS

44.     Par Pharma, a U.S.-based specialty pharmaceutical company, develops, manufactures and markets high-barrier-to-entry generic drugs and niche, innovative proprietary pharmaceuticals. It operates through its wholly-owned subsidiary's two operating divisions, Par Pharmaceutical and Strativa Pharmaceuticals.

45.     On July 16, 2012, Par Pharma and TPG announced that the companies signed the Merger Agreement by which TPG will acquire Par Pharma for a merger consideration of $50 per share in cash.  Upon the terms of the agreement, Acquisition Sub will merge with and into Par Pharma with Par Pharma surviving as a wholly-owned subsidiary of Sky Growth.  The Proposed Transaction was unanimously approved by the Board.

46.     The press release announcing the Proposed Transaction stated, in pertinent part:

Par Pharmaceutical Companies, Inc. (NYSE: PRX) announced today that it has entered into a definitive merger agreement to be acquired by an affiliate of TPG in a transaction with an equity value of $1.9 billion.

Under the terms of the agreement, Par shareholders will receive $50.00 in cash for each share of Par common stock, representing a premium of approximately 37% over the closing share price on July 13, 2012, the last full trading day before today's announcement.  The agreement was unanimously approved by Par's Board of Directors.

Patrick G. LePore, Par's Chairman and CEO, stated, "We are excited about this transaction as it delivers compelling value to our shareholders."  Mr. LePore continued, "While my focus and that of the Par Board of Directors was on shareholder value, we are very pleased that Par will be acquired by TPG, a leading global private investment firm whose substantial resources and healthcare experience will enable Par to continue to invest in its future long-term growth."

"We are excited for the opportunity to invest in Par, a leading generic pharmaceutical company that has a long track record of success via its focus on complex products and its strong, diversified product pipeline," said Todd B. Sisitsky, partner at TPG.  "The company is positioned to benefit from the strong macro trends of a greater focus on cost effective healthcare solutions and the increasing demands from an

aging population.  We look forward to partnering with this talented management team to continue developing an attractive platform for expansion."

The closing of the transaction is conditioned upon, among other things, the affirmative vote of the holders of a majority of Par's outstanding shares, clearance under the Hart-Scott-Rodino (HSR) Antitrust Improvements Act of 1976, and other customary closing conditions.  The transaction is not subject to a financing condition.

Under the terms of the merger agreement, Par may solicit superior proposals from third parties through August 24, 2012.  The Par Board of Directors, with the assistance of its advisors, will actively solicit acquisition proposals during this period.  There are no guarantees that this process will result in a superior proposal.  If there is no superior proposal, the transaction is expected to close in 2012, subject to customary approvals and closing conditions.  Par and the Board of Directors do not intend to disclose developments with respect to the solicitation process unless and until the Board of Directors has made a decision.

J.P.Morgan Securities LLC acted as exclusive financial advisor to Par, and Orrick, Herrington & Sutcliffe LLP acted as Par's legal advisor.  Cravath, Swaine & Moore LLP acted as independent legal counsel to Par's Board of Directors.  Bank of America Merrill Lynch, Deutsche Bank Securities Inc. and Goldman, Sachs & Co. and affiliates acted as financial advisors and provided fully committed financing to TPG.  Ropes & Gray LLP acted as legal advisor to TPG.

47.     The Proposed Transaction is the product of an unfair sales process designed to ensure that only TPG has the opportunity to acquire Par Pharma.  The Proposed Transaction is driven by Par Pharma's largest stockholder (a holder of 9.9% of Par Pharma's outstanding common stock), as well as the Company's Board and executive officers (collective holders of an additional 3.7% of Par Pharma common stock).

**Relational's Influence on the Proposed Transaction**

48.     Relational sought out the Proposed Transaction in order to secure liquidity for its illiquid holdings in the Company.

49.     On May 7, 2012, a Form SC 31D/A was filed by Relational Investors Mid-Cap Fund I, L.P., Relational Investors Mid-Cap Fund II, L.P., and Relational Investors, LLC (collectively, "Relational"), in which Relational revealed that it owned 9.9% of the Company's outstanding shares and urged the Board and management to seek a sale to a strategic buyer.

50.     Specifically, according to the filing, Relational acquired additional shares in Par Pharma because it believes that "such [s]hares are undervalued by the market at the present time." The filing also noted that Relational, "[o]n November 9, 2011 and again on April 4, 2012, . . . presented [its] views and concerns about this undervaluation to the Company's management team, including the CEO."  Relational believes that "management understands the factors contributing to the [s]hares' undervaluation and is taking steps to improve the Company's valuation.  In particular, [Relational] note[s] recent improvements in Company operations and the consequent improvement in valuation of the [s]hares."

51.     The filing further noted that although Relational "continue[s] to gain confidence that actions taken by the Company's management will continue to improve the value of the [s]hares and that the Company is positioned to generate sustainable earnings growth beyond 2012[, Relational] . . . believe[s] that over time the [s]hares will continue to sell for a substantial discount to the value available in a strategic sale to a larger company with similar products [because] . . . of industry challenges and the Company's sub-optimal size and product scope."

52.     In other words, "[Relational] believe[s] that this opportunity presents a high hurdle against which stand-alone strategies must be measured."  Going forward, "[Relational] intend[s] to closely monitor management's progress toward improving the Company's operations and share valuation.  Depending on such progress (or lack thereof) [Relational] may modify [its] plans."

53.     The Board was ready and willing to help Relational to secure the liquidity it sought for its illiquid holdings in the Company.  The Board and executive management also had their own interests in delivering the Company to TPG.  That interest hinged on securing **over $108 million** in material benefits for themselves as a result of the Proposed Transaction, including almost $70 million from the accelerated vesting and monetization of their illiquid equity holdings in the

Company (collectively 3.7% of Par Pharma's outstanding stock) and change-of-control severance payments, which will provide over $38 million more to members of Par Pharma's management.

54.     Having been pushed and threatened by Relational, on March 30, 2012, the Board accepted conflicted managements' recommendation to pursue the sale of the Company.

55.     In so doing, the Board placed the process of selling the Company in the hands of conflicted management and it's conflicted Board member Joseph Smith, who holds over 146,000 shares of Par Pharma and will receive over $7.3 million from the Proposed Transaction. The Board then compounded its breach by directing Smith and management to work with conflicted J.P. Morgan Securities LLC ("JP Morgan") to identify potential acquirers.

**JP Morgan's Conflicted Role in the Process Leading to the Proposed Transaction**

56.     The Board breached its duties to the shareholders by hiring JP Morgan to act as its financial advisor in connection with the Proposed Transaction, despite JP Morgan's continuous and substantial business relationship with TPG.

57.     Over the past year, JP Morgan (including its affiliates) has advised TPG on at least three possible transactions.

58.     JP Morgan also provided financing to TPG in connection with an acquisition last year.

59.     In the last two years alone, JP Morgan has been been paid $6 million in fees by Par Pharma, but almost ***24 times more in fees by TPG*** [approximately $143 million].

60.     Last year, JP Morgan both advised and provided fully committed financing to TPG in connection with TPG's acquisition of Immucor, Inc. Additionally, JP Morgan advised TPG in connection with the attempted acquisition of GlobeOp Financial Services and the possible acquisition of LHC Group. Because TPG is a continued and repeat client of JP Morgan, JP Morgan is conflicted and unable to provide unbiased financial advice to Par Pharma in connection with the

Proposed Transaction. The Board breached its duties to the shareholders by hiring JP Morgan to advise Par Pharma in connection with a sale of the Company to TPG.

61.     As a result of this highly conflicted process, management and JP Morgan presented the Board, in early April 2012, with just five potential acquirers (out of the list that had been previously presented to the Board on March 30, 2012). While three of those acquirers (two financial, one strategic) expressed an interest in Par Pharma, the Board consistently refused throughout the process to consider any other potential acquirers or even conduct a pre-signing market check to identify market interest in acquisition of Par Pharma.

62.     The process was clearly designed to favor TPG over any other acquirers. TPG was favored as both an important client of JP Morgan's and as a financial buyer that was much more likely to retain management than a strategic buyer.

63.     Ultimately, on July 9, 2012, TPG presented Par Pharma with an offer to purchase the Company for $50 per share in cash, but it expressly conditioned it's offer on receiving an opportunity to discuss equity and employment terms with Company management. TPG's "carrot" had the intended effect: three days later, on July 12, 2012, TPG began discussions with defendant LePore and other members of management regarding equity and employment terms to be implemented in conjunction with a successful Proposed Transaction. Not surprisingly, two days later, on July 14, 2012, and without so much as a counteroffer to TPG from the Board – in fact **the Board never negotiated with TPG over price** – the Board agreed to sell the Company to TPG for $50 per share cash.

**Value of Par Pharma in Connection with the Proposed Transaction**

64.     The conflicted and unfair process leading to the Proposed Transaction has resulted in an unfair deal price that significantly undervalues Par Pharma.

65. Commenting on the Proposed Transaction, Defendant LePore, Chairman and CEO of Par Pharma, stated, in pertinent in part, as follows:

> We are excited about this transaction as it delivers compelling value to our shareholders. While my focus and that of the Par Board of Directors was on shareholder value, we are very pleased that Par will be acquired by TPG, a leading global private investment firm whose substantial resources and healthcare experience will enable Par to continue to invest in its future long-term growth.

66. Also commenting on the Proposed Transaction, Todd B. Sisitsky, a partner at TPG Parent, stated, in pertinent part, as follows:

> We are excited for the opportunity to invest in Par, a leading generic pharmaceutical company that has a long track record of success via its focus on complex products and its strong, diversified product pipeline. The company is positioned to benefit from the strong macro trends of a greater focus on cost effective healthcare solutions and the increasing demands from an aging population. We look forward to partnering with this talented management team to continue developing an attractive platform for expansion.

67. Indeed, the value of Par Pharma's stock is greater than the consideration offered in the Proposed Transaction, particularly when considering the Company's present and future growth prospects and objectives.

68. For example, Company executives at the most recent investor day conference on January 6, 2012 touted Par Pharma's future prospects by stating, among other things, that: (i) peak sales of the Company's vitamin B12 nasal spray Nascobal will be achieved beyond 2012; (ii) Par Pharma will be releasing 10 to 14 drugs per year from 2012 through 2014; and (iii) Par Pharma sees "record" gross margin ahead, expecting 47% in 2012, 48% in 2013, and 50% in 2014.

69. Additionally, Par Pharma also promoted that the foundation for the Company's growth was in place, citing the following 2011 highlights: (a) acquired Anchen Pharmaceuticals and Edict Pharmaceuticals; (b) executed numerous business development deals; (c) successfully launched eight products; (d) right-sized branded division; (e) passed all FDA inspections; (f) settled litigations; and (g) reported strong financial results.

70.     The Company has numerous lines of growth potential, including its existing product line, recently filed Abbreviated New Drug Applications ("ANDAs"), R&D future pipeline, and business development.  Only recently, the Company received FDA approvals, acquired ANDAs from other pharmaceutical companies, and began shipping generic versions of several lucrative drugs.  For example:

(a)     on July 13, 2012, a unit of the Company received its first FDA approval of the 100 mg, 200 mg, and 300 mg tablets of its generic version of the drug Trandate;

(b)     on April 19, 2012, the Company announced that it entered into an exclusive acquisition and licensing agreement with Handa Pharmaceuticals LLC to acquire Handa's ANDA for dexlansoprazole capsules, which is the generic version of Takeda's Dexilant.  According to the IMS Health data, annual sales in the United States for the 60 mg strength of Dexilant are approximately $517 million;

(c)     on April 6, 2012, the Company announced that it began shipping its generic version of Teva Pharmaceutical's Provigil.  According to IMS Health data, annual sales for Provigil in the United States are approximately $1.1 billion;

(d)     on October 24, 2011, the Company announced that it began shipping the 5 mg, 10 mg, 15 mg, and 20 mg strengths of olanzapine orally disintegrating tablets, the generic version of Lilly's Zyprexa Zydis.  According to IMS Health data, annual sales in the Unites States of Zprexa Zydis are approximately $360 million;

(e)     on October 18, 2011, the Company announced that it acquired rights to three products from Teva Pharmaceuticals, including ownership of the ANDAs of fentanyl citrate lozenges, a generic version of Actiq and cyclobenzaprine ER capsules, the generic version of Amrixas, as well as the U.S. rights to market modafinil tablets, the generic version of Provigil.  According to IMS Health data, annual sales in the United States of Actiq and equivalent generic products are $ 173

million, and annual sales in the United States for Provigil and Amrix are $1.1 billion and $125 million, respectively; and

(f)      on January 3, 2011, the Company announced that it began shipping the 225 mg, 325 mg, and 425 mg strengths of propafenone SR capsules, the generic version of GlaxoSmithKline's Rythmol.  According to IMS Health data, annual sales in the United States of Rythmol are approximately $121 million.

71.      The Company, not surprisingly, has also had outstanding financial results over the last few quarters.  On February 28, 2012, for example, the Company announced its financial results for its fourth quarter and full year 2011 ended December 31, 2011.  The Company reported the following highlights:

> For the fourth quarter ended December 31, 2011, the Company reported total revenues of $253.6 million and income from continuing operations of $31.3 million, or $0.85 per diluted share, which includes approximately $14 million of favorable tax benefits.   On an adjusted cash basis (non-GAAP measure), which excludes amortization expenses, other transaction-related costs and certain tax items, income from continuing operations was $28.9 million, or $0.78 per diluted share for the fourth quarter 2011.

> For the full year ended December 31,2011, total revenue was $926.1 million with a loss from continuing operations of $46.3 million, or $1.29 per diluted share, as a result of a first quarter pre-tax litigation charge of $190.6 million as well as a second quarter restructuring charge of $27.0 million.  On an adjusted cash basis (non-GAAP measure), which excludes amortization expenses and certain items as detailed in the attached reconciliation, income from continuing operations was $121.7 million, or $3.32 per diluted share.   On an adjusted cash basis, income from continuing operations for the full year 2010 was $105.0 million, or $2.95 per diluted share.

72.      During the earnings call associated with the February 2012 financial results announcement, Defendant LePore, commenting on the Company's fourth quarter and full year 2011 financial results, *as well as the Company's poise for growth*, stated, in pertinent part, as follows:

> The team is very pleased to be reporting out on another outstanding quarter for Par representing the capstone what I would describe as a transformative year for the Company.  . . . Some of the financial highlights of the year include record annual gross margin of approximately $387 million, our third consecutive year of record gross margin, and record earnings per share for the year of $3.32.

- 18 -

In summary, *the company simply had another outstanding year from every financial metric, but more important took great strides towards defining Par as a unique growth story in our space through several key strategic moves* highlighted by the acquisitions of Anchen and Edict, which doubled our ANDA count and tripled our product development opportunities and to Teva product deal adding significantly to our current and future portfolio.

The year was also marked by several successful generic launches and the realignment of our brand business making it an important contributor to our overall business.

Finally, we capped off the year by laying out a detailed strategic and financial plan for the next three years at our Analyst Day meeting in New York and I will circle back to that day in a few minutes. But to sum up, 2011 was another year in which we performed well in the short term while continuing to build for the long term. I can also tell you that 2012 is off to a strong start.

We completed and already integrated Edict and we are proud to say they are already producing tangible results for Par. Similarly, the integration of Anchen continues to goes smoothly and we feel stronger than ever about the opportunities that will come from our colleagues in Irvine.

From a market standpoint, we continue to enjoy limited competition on our top generic products and we are preparing for several new product launches in the next few months. Additionally, Megace ES and Nascobal are experiencing nice script trends. And finally, I'd like to emphasize that we continue to be extremely active on the business development front.

* * *

As we said in January and still believe today, *we've never been positioned better for growth*, with all of the key elements for success coming together, with the right size, with the right strategy, and the right market, with the right people.

[Emphasis added]

73. On May 8, 2012, the Company announced its financial results for its first quarter 2012 ended March 31, 2012. The Company reported "total revenues of $271.5 million and loss from continuing operations of $28.7 million."

74. During the earnings call, Defendant LePore, commenting on the Company's first quarter 2012 financial results, stated, in pertinent part, as follows:

I'm pleased to report to our investors that 2012 is off to a very, very good start with first quarter performance resulting in cash earnings per share of $0.80. Significant takeaways for the quarter are as follows. This quarter reflected the new Par

Pharmaceuticals inclusive of Anchen and Edict from both a commercial and development standpoint.  And I am proud to say that we've had filings, ANDA filings from all three of our development teams putting us ahead of pace towards our goal of 13 to 17 filings per year.  Its significant to note that as expected our first quarter results included no new product launches a testament to the strength of our portfolio and to our core strategy of identifying developing and commercializing products which have market longevity, and that certainly bodes well for the rest of the year as we anticipate 10 to 14 product launches from April through December.

Another highlight of the quarter (indiscernible) one of our ongoing core strategies was the announcement of the Handa deal in which we acquired the rights to market generic Dexilant adding yet another first to file to our pipeline.  I'll point out that our business development team continues to be extremely active and that the deal flow is very, very strong.

Similarly we recently launched PROVIGIL one of the products we acquired from Teva last year in conjunction with our acquisition of Cephalon.  Working with companies as divestitures become necessary is also essential to our strategy and you can expect this to always be in the running as these opportunities arise.

75.    In addition to the Company's strong performance over recent quarters, the Company is positioned to grow going forward.  Indeed, at the annual Analyst Day conference on January 6, 2012, the Company's presentation highlighted, as one of the key takeaways, that Par Pharma "is positioned for significant growth over the next three years and beyond."  The presentation concluded that Par Pharma's "three-year financial plan backed by a track record of success makes Par a very attractive investment today."

76.    Indeed, prior to the announcement of the Proposed Transaction, several analysts have estimated that the Company was worth approximately $50 per share or more.  For example:

(a)    on May 9, 2012, analyst James Molloy of ThinkEquity LLC raised his price target on Par Pharma to $50 per share.  In that report he noted that if the Company fetched a multiple of 2.4x revenues – which is what Watson Pharmaceuticals paid to acquire the generic drug maker Actavis Group – the Company would be valued around $80 per share;

(b)    on May 9, 2012, analyst David G. Buck of the Buckingham Research Group increased his 12-month price target to $50 per share;

(c)     on June 8, 2012, analyst David Amsellem, Sr. of Piper Jaffray & Co. issued a report on Par Pharma in which he reiterated his overweight rating and $49 price target; and

(d)     on May 11, 2012, Kevin Kendra of Gabelli & Company, Inc. ("Gabelli") stated: "We continue to recommend purchase of PRX as one of the cheapest stocks in thegeneric drug sector . . . ."  Gabelli uses a methodology of determining a private market value ("PMV") which is the price Gabelli believes an informed industrialist would pay to acquire the company in its entirety.  As of May 11, 2012, ***Kendra determined the PMV for Par Pharma was $67 for 2012, $72 for 2013, and $84 for 2014***.

77.     Even after the Proposed Transaction was announced, some analysts suggested that the offer was too low.  On the day the deal was announced, for example, Ami Fadia of UBS stated: "We believe that this business can easily generate cash flows of about $200 million to $250 million a year, which we value at closer to $60 a share in the hands of a strategic buyer who would be able to drive synergies."

**Deal Protections as Preclusive Measures**

78.     The Proposed Transaction was timed to confer the benefits of these exceedingly positive financial and operational results to TPG and deprive Par Pharma shareholders of those benefits.  In addition, the Merger Agreement contains deal-protection measures that are designed to preclude the emergence of a superior offer.

79.     For example, although the Merger Agreement provides for a "go-shop" period, which will expire on August 24, 2012, the "go-shop" provisions are illusory, unfair and tilt the sale process in favor of TPG.  The go-shop period is a 39 days – not nearly enough time for an adequate market check, particularly when combined with the other deal protections agreed to in the Merger Agreement.

80.     Specifically, pursuant to the Merger Agreement, the Company must notify TPG of any alternative acquisition proposal or offer received by the Company, and must provide TPG with details, including the identify of each party that submitted a written acquisition proposal, a description of the status of any discussions, and an unredacted copy of any written acquisition proposal.

81.     Following the "go-shop" period, the Merger Agreement contains a "no-shop" provision which precludes Par Pharma from: (i) initiating, soliciting, facilitating or knowingly encouraging the making of an acquisition proposal; (ii) engaging in, continuing or otherwise participating in any negotiations or discussions concerning, or furnishing to any person any material information with respect to, an acquisition proposal; (iii) entering into any letter of intent, agreement or agreement in principle with respect to an acquisition proposal; or (iv) otherwise knowingly facilitating any effort or attempt to make an acquisition proposal.

82.     Moreover, any discussions with parties who made acquisition proposals during the "go-shop" period must end on September 13, 2012.  And, even if the Company decides that a proposal constitutes or is likely to lead to a superior transaction, the Merger Agreement requires the Company to re-negotiate with TPG for three full business days in an effort to render such competing proposal non-superior.

83.     Thus, the Merger Agreement unfairly assures that any "auction" will favor TPG, as no rival bidder is likely to emerge due to TPG's unconditional matching rights. These provisions, therefore, can only have been designed to provide an even greater layer of protection for the Proposed Transaction and effectively dissuade the emergence of competing offers.

84.     In addition, the Merger Agreement requires the Company, under certain circumstances, to pay TPG a termination fee.  If the Company terminates the Proposed Transaction in order to enter a transaction with a third party, the Company will have to pay TPG $24 million.  If the

termination fee becomes payable in other circumstances, the amount of the termination fee will be $48 million.

**The Proxy's Omission and Misrepresentation of Material Information**

85.     In an attempt to secure shareholder support for the unfair Proposed Transaction, on August 2, 2012, defendants issued the materially false and misleading Proxy.  The Proxy, which recommends that Par Pharma shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information about the unfair sales process for the Company, conflicts of interest that corrupted the sales process, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company on a stand-alone basis and as a merger partner for TPG.  Specifically, the Proxy omits and/or misrepresents the material information set forth below, in direct contravention of §§14(a) and 20(a) of the Exchange Act and/or defendants' fiduciary duty of disclosure under state law.

86.     *The nature of JP Morgan's prior services to or retentions by Par Pharma.*  While the Proxy states that JP Morgan "had commercial or investment banking relationships with the Company," there is no information in the Proxy about when and in what context JP Morgan previously advised Par Pharma.  This information is material because shareholders are entitled to know if their fiduciaries have interests in the transaction that are even potentially in conflict with the shareholders' interest in maximized value.  Shareholders must be told of all potential and actual conflicts of interests that bear on the Board's ability to objectively assess merger transactions.

87.     *Whether and how the Board considered the conflicts presented by the Board's selection of JP Morgan as its financial advisor*.  Given that TPG has – just in the past two years – paid JP Morgan $143 million, an amount that is 24 times what Par Pharma paid JP Morgan in the same period, there is no information in the Proxy about whether or how the Board considered or addressed this very apparent conflict.  This information is material because the Board has a duty to

secure the best price available for the Company, and shareholders are entitled to know if their fiduciaries have interests in the transaction that are even potentially in conflict with the shareholders' interest in maximizing value, and how the Board has addressed and resolved such conflicts in the process of selling the Company.

88.     ***Given the obvious conflicts presented by JP Morgan's retention as the Board's financial advisor, the bases for the Board's conclusion that it did not need a different or at least additional financial advisor.***  Given the longstanding business relationship between TPG and JP Morgan, there is no information in the Proxy about the Board's discussion of or effort to eliminate the impact of this conflict on the sales process.  Shareholders are entitled to know if their fiduciaries have interests in the transaction that are even potentially in conflict with the shareholders' interest in maximizing value.  This information is material because shareholders must be told of all potential and actual conflicts of interests that bear on the Board's ability to objectively assess merger transactions.

89.     ***The basis for the independent directors' decision not to retain a separate, unconflicted financial advisor.***  Given the longstanding business relationship between TPG and JP Morgan, there is no information in the Proxy about the independent directors' discussion of or effort to eliminate the impact of this conflict on the sales process.  Shareholders are entitled to know if their fiduciaries have interests in the transaction that are even potentially in conflict with the shareholders' interest in maximizing value.  This information is material because shareholders must be told of all potential and actual conflicts of interests that bear on the Board's ability to objectively assess merger transactions.

90.     ***Whether on March 30, 2012 the Board considered any other alternatives and if so, what alternatives, and if not why not***.  The Proxy does not indicate whether in deciding on March 30, 2012 to pursue a sale of the Company, the Board considered any alternatives other than a sale or

pursuing Par Pharma's standalone business plan.  This information is material because the Board has

a duty to maximize shareholder value among all competing strategic alternatives.  Shareholders are

entitled to be informed before they are asked to vote on the Proposed Transaction about the various

strategic alternatives considered by the Board, and the value to shareholders of those various

alternatives as reviewed by the Board.

91.     *Whether prior to or during March 30, 2012, the Board sought advice to narrow the*

*alternatives to just these two*.  The Proxy does not indicate whether in deciding on March 30, 2012

to pursue a sale of the Company, the Board sought any advice about the alternatives it would

consider other than a sale or pursuing Par Pharma's standalone business plan.  This information is

material because the Board has a duty to maximize shareholder value among all competing strategic

alternatives.  Shareholders are entitled to be informed before they are asked to vote on the Proposed

Transaction about the various strategic alternatives considered by the Board, and the value to

shareholders of those various alternatives as reviewed by the Board.

92.     *The number of potential interested parties the Board discussed on March 30, 2012*

*that were strategic and the number that were financial.*  While the Proxy indicates that the Board

discussed possible interested parties, including strategic and financial acquirors, there is no

information or indication of the numbers of each type of acquiror that the Board discussed.  This

information is material because the Board has a duty to secure the best price available for the

Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.

Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction

regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in

light of the excessive termination fee, which, along with the other preclusive deal protection devices,

destroys the "go-shop" opportunity to conduct a post-signing market check.

93.      *The basis for the Board's March 30, 2012 determination that some parties "might not be interested."*  While the Proxy indicates that the Board concluded that some potential acquirors "for various reasons, might not be interested in a Potential Transaction," there is no information about the bases for the Board's conclusion.  This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, destroys the "go-shop" opportunity to conduct a post-signing market check.

94.      *Why the Board did not consider JP Morgan's banking and other business relationships with Party A.*  Given the longstanding business relationship between TPG and JP Morgan, there is no information in the Proxy about the independent directors' discussion of or effort to determine if such a conflict existed with Party A.  Shareholders are entitled to know if their fiduciaries have interests in the transaction that are even potentially in conflict with the shareholders' interest in maximizing value.  This information is material because shareholders must be told of all potential and actual conflicts of interests that bear on the Board's ability to objectively assess merger transactions.

95.      *Whether and how the list of potential acquirers JP Morgan contacted on April 9-10, 2012 differed from management's "possible interested parties" from the March 30, 2012 Board meeting.*  While the Proxy indicates that the Board discussed possible interested parties, including strategic and financial acquirors, there is no information or indication of the numbers of each type of acquiror that the Board discussed, or whether the potential acquirers contacted by JP Morgan had been previously discussed and considered by the Board.  This information is material

because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection device, negates the "go-shop" opportunity to conduct a post-signing market check.

96.     *Why the Board was presented with 5-year projections, while JP Morgan used 10-year projections in its fairness analysis*.  In the Proxy, Defendants fail to disclose why the Board was presented with 5-year projections, while JP Morgan used 10-year projections in its fairness analysis.  By failing to disclose these different projections were used, Defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

97.     *The "detailed financial model" provided to TPG, Party A and Party B on May 22, 2012*.  While the Proxy indicates that Par Pharma provided TPG, Party A and Party B with a "detailed financial model" on May 22, 2012, there is no information or detail provided about the model.  This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to disclose these different projections were used, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price. Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, negates the "go-shop" opportunity to conduct a post-signing market check.

98.     *Whether the "detailed financial model" provided to TPG, Party A and Party B on May 22, 2012 corresponds to the projections on p. 45 of the Proxy*.  While the Proxy indicates that

Par Pharma provided TPG, Party A, and Party B with a "detailed financial model" on May 22, 2012, there is no information or detail provided about the model. This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders. By failing to disclose these different projections were used, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price. Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, destroys the "go-shop" opportunity to conduct a post-signing market check.

99. ***The impact of the Pronova decision on Par Pharma's outlook.*** While the Proxy identifies the decision in the *Pronova* litigation, there is no information or detail provided about the impact of that decision on Par Pharma and its prospects. This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders. By failing to disclose the impact of the *Pronova* decision on Par Pharma and its prospects, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price. Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection device, destroys the "go-shop" opportunity to conduct a post-signing market check.

100. ***All quantitative analyses prepared by Par Pharma and/or JP Morgan to estimate the impact of the Pronova decision on Par Pharma***. While the Proxy identifies the decision in the *Pronova* litigation, there is no information or detail provided about the impact of that decision on Par

Pharma and its prospects.  This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to disclose the impact of the *Pronova* decision on Par Pharma and its prospects, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, destroys the "go-shop" opportunity to conduct a post-signing market check.

101.    ***Whether any quantitative analyses to estimate the impact of the Pronova decision on Par Pharma were provided to any potential acquirers***.  While the Proxy identifies the decision in the *Pronova* litigation, there is no information or detail provided about the impact of that decision on Par Pharma and its prospects.  This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to disclose the impact of the *Pronova* decision on Par Pharma and its prospects, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection device, destroys the "go-shop" opportunity to conduct a post-signing market check.

102.    ***The powers of and restrictions on the Steering Committee.***  While the Proxy identifies the creation of the Steering Committee, there is no information about the Steering Committee's powers and restrictions.  This information is material because the Board has a duty to

secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to disclose the powers of and restrictions on the Steering Committee, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection device, destroys the "go-shop" opportunity to conduct a post-signing market check.

103.    ***The independent directors' power to form the Steering Committee without the involvement of the full Board.***  While the Proxy identifies the creation of the Steering Committee, there is no information about the independent directors' power to form the Steering Committee without the involvement of the full Board.  This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to disclose anything about whether the independent directors even had the power to form the Steering Committee without the involvement of the full Board, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection device, destroys the "go-shop" opportunity to conduct a post-signing market check.

104.    ***The bases for selecting the members of the Steering Committee.***  While the Proxy identifies the creation of the Steering Committee, there is no information about the bases for the selection of the members of the Steering Committee.  This information is material because the Board

has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to disclose anything about the bases for the selection of the members of the Steering Committee, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, destroys the "go-shop" opportunity to conduct a post-signing market check.

105.    ***The reasons the Steering Committee took no action until July 10, 2012.***  While the Proxy identifies the creation of the Steering Committee, there is no information why the Steering Committee took no action until July 10, 2012, ***just four days before the Board agreed to sell Par Pharma to TPG***.  This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to disclose anything why the Steering Committee took no action until just before the Board agreed to sell Par Pharma, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection device, destroys the "go-shop" opportunity to conduct a post-signing market check.

106.    ***Whether the independent directors did anything to determine if any bidders had employment or compensation discussions with members of Par Pharma's management prior to receiving express authorization from the Board***.  The Proxy provides no information about whether the independent directors did anything to determine if any bidders had employment or compensation

discussions with members of Par Pharma's management prior to receiving express authorization from the Board.  Shareholders are entitled to know if their fiduciaries have interests in the transaction that are even potentially in conflict with the shareholders' interests in maximized value. This information is material because shareholders must be told of all potential and actual conflicts of interests that bear on the Board's ability to objectively assess merger transactions.

107.   ***The nature of the supplemental information about product updates provided to Party A.***   While the Proxy indicates that Par Pharma provided Party A with "supplemental" information about product updates, the Proxy provides no detail about that supplemental information.  This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to disclose anything regarding the nature of the supplemental information about product updates provided to Party A, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, destroys the "go-shop" opportunity to conduct a post-signing market check.

108.   ***Whether any of the supplemental information about product updates provided to Party A was quantitative.***   While the Proxy indicates that Par Pharma provided Party A with "supplemental" information about product updates, the Proxy provides no detail about that supplemental information.  This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to disclose anything regarding the nature of the supplemental information about product updates provided to Party A, Defendants inhibit an investor from making

a determination as to the fairness of the sales process or the offer price.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, destroys the "go-shop" opportunity to conduct a post-signing market check.

109.   *Whether any of the supplemental information about product updates provided to Party A impacted the financial projections provided to the bidders*.  While the Proxy indicates that Par Pharma provided Party A with "supplemental" information about product updates, the Proxy provides no detail about that supplemental information.  This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to disclose anything regarding the nature of the supplemental information about product updates provided to Party A, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, destroys the "go-shop" opportunity to conduct a post-signing market check.

110.   *The "recent events" other than the Pronova litigation that led the Steering Committee to expect lower valuations and bids in the second round of bidding than in the first round*.  While the Proxy generically identifies "recent events" other than the *Pronova* litigation that led the Steering Committee to expect lower valuations and bids in the second round of bidding than in the first round, the Proxy provides no detail about those "recent events."  This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders.  By failing to

disclose anything about those "recent events," Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price. Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, destroys the "go-shop" opportunity to conduct a post-signing market check.

111.   ***Identification of and details about the "recent events that affected the valuation of the Company."*** While the Proxy generically identifies "recent events that affected the valuation of the Company," the Proxy provides no detail about those "recent events." This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders. By failing to disclose anything about those "recent events," Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price. Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, destroys the "go-shop" opportunity to conduct a post-signing market check.

112.   ***The analytical measures taken by JP Morgan to consider the impact of the "recent events that affected the valuation of the Company*.*"*** While the Proxy generically identifies "recent events that affected the valuation of the Company," the Proxy provides no detail about those "recent events," or about any analytical measures taken by JP Morgan to consider the impact of the "recent events that affected the valuation of the Company." This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders. By failing to disclose anything about those

"recent events," Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price.  Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, destroys the "go-shop" opportunity to conduct a post-signing market check.

113.    ***With respect to the Prospective Financial Information provided to JP Morgan, the difference between non-GAAP operating income and GAAP operating income***.  Given that this prospective financial information in the Proxy does not include unlevered free cash flow (used in JP Morgan's *Discounted Cash Flow Analysis*) or earnings (used in JP Morgan's *Public Trading Multiples Analysis*), the omission of the difference between non-GAAP and GAAP operating income in these projections renders the Proxy materially misleading.  By failing to disclose the difference between non-GAAP and GAAP operating income in these projections, Defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

114.    ***With respect to the Prospective Financial Information provided to JP Morgan, why the projections declined so materially between April and July***.  Given the importance of this prospective information in the Proxy to the fairness opinion of JP Morgan, the omission of any discussion about why these projections declined so materially renders the Proxy materially misleading.  By failing to disclose anything about the decline in these projections, Defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

115.    ***With respect to the Prospective Financial Information provided to JP Morgan, why 2012 capital expenditures increased so dramatically***.  Given the importance of this prospective information in the Proxy to the fairness opinion of JP Morgan, the omission of any discussion about the dramatic and material increase in capital expenditures renders the Proxy materially misleading.

By failing to disclose anything about the material increase in capital expenditures, Defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

116.    **With respect to the Prospective Financial Information provided to JP Morgan, why there is a significant dip in 2013 EBITDA and operating income compared to both 2012 and 2014.** Given the importance of this prospective information in the Proxy to the fairness opinion of JP Morgan, the omission of any discussion about the significant and material dip in 2013 EBITDA renders the Proxy materially misleading. By failing to disclose anything about the material dip in 2013 EBITDA, defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

117.    **With respect to the fairness opinion of JP Morgan, the definition of "Firm Value," and the calculation in detail for Par Pharma.** The Proxy states that to arrive "at equity value per share for the Company, the analysis started with the determination of Firm Value." As equity value is an important and material component of JP Morgan's fairness opinion, Defendants' omission of any detail or description of "Firm Value," or the derivation thereof, renders the Proxy materially misleading. By failing to disclose anything about "Firm Value," Defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

118.    **With respect to the fairness opinion of JP Morgan, an explanation of "settlements and contingencies."** The Proxy states that "settlements and contingencies" were a part of the calculation of equity value. As equity value is an important and material component of JP Morgan's fairness opinion, Defendants' omission of any detail or description of "settlements and contingencies," or the value thereof, renders the Proxy materially misleading. By failing to disclose anything about "settlements and contingencies," Defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

119.     ***With respect to JP Morgan's Public Trading Multiples Analysis, Par Pharma's pricing multiples for both the previous closing price and the offer price***.  The discussion of JP Morgan's *Public Trading Multiples Analysis* in the Proxy does not include Par Pharma's pricing multiples for both the previous closing price and the offer price.  By failing to disclose Par Pharma's pricing multiples for both the previous closing price and the offer price, Defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

120.     ***With respect to JP Morgan's Selected Transaction Analysis, inclusion of all pricing multiples used in the analysis***.  The discussion of JP Morgan's *Selected Transaction Analysis* in the Proxy provides only a single pricing multiple.  By failing to disclose any other pricing multiples, Defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

121.     ***With respect to JP Morgan's Selected Transaction Analysis, inclusion of Par Pharma's pricing multiples based on the offer price***.  The discussion of JP Morgan's *Selected Transaction Analysis* in the Proxy excludes Par Pharma's pricing multiples.  By failing to disclose Par Pharma's pricing multiples, Defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

122.     ***With respect to JP Morgan's Selected Transaction Analysis, identification of the Anchen transaction multiple and why it is not meaningful***.  The discussion of JP Morgan's *Selected Transaction Analysis* in the Proxy excludes the Anchen pricing multiple as "not meaningful," but provides no explanation or information about why the Anchen pricing multiple is "not meaningful."  By failing to disclose the Anchen pricing multiple and why the Anchen pricing multiple is "not meaningful," Defendants inhibit an investor from making a determination as to the reliability of JP Morgan's fairness opinion.

123. ***JP Morgan's "preliminary valuation analyses" and valuation ranges presented to the Board on May 17, 2012.*** While the Proxy indicates that on May 17, 2012, JP Morgan presented the Board with "preliminary valuation analyses" and valuation ranges, and that the three bids received from TPG, Party A and Party B were each at or near the top of the valuation ranges presented by JP Morgan, there is no information or detail provided about JP Morgan's preliminary valuation analyses and valuation ranges. This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders. By failing to disclose these preliminary valuation analyses and valuation ranges, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price. Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, negates the "go-shop" opportunity to conduct a post-signing market check.

124. ***JP Morgan's "preliminary valuation analyses" and valuation ranges presented to the Board on July 11, 2012.*** While the Proxy indicates that on July 11, 2012, JP Morgan presented the Board with "preliminary valuation analyses" and valuation ranges, and that the bid received from TPG was at or near the top of the valuation ranges presented by JP Morgan, there is no information or detail provided about JP Morgan's preliminary valuation analyses and valuation ranges. This information is material because the Board has a duty to secure the best price available for the Company, and conduct at least some form of an auction process to fulfill that duty to shareholders. By failing to disclose these preliminary valuation analyses and valuation ranges, Defendants inhibit an investor from making a determination as to the fairness of the sales process or the offer price. Shareholders are entitled to be informed before they are asked to vote on the Proposed Transaction

regarding the Board's efforts to maximize shareholder value by shopping the Company, especially in light of the excessive termination fee, which, along with the other preclusive deal protection devices, negates the "go-shop" opportunity to conduct a post-signing market check.

125.    As explained above, this information is material to the impending decision of Par Pharma's shareholders whether or not to vote in favor of the Proposed Transaction. As such, Defendants' violations of §§14(a) and 20(a) of the Exchange Act and their breaches of fiduciary duty under state law to maximize shareholder value and disclose all material information in connection with a merger transaction threaten shareholders with irreparable harm for which money damages are not an adequate alternate remedy. Thus, Plaintiff seeks injunctive relief to ensure that Defendants cure their breaches of fiduciary duty and violations of §§14(a) and 20(a) before Par Pharma shareholders are asked to vote on the Proposed Transaction, and that Defendants are not permitted to seek shareholder support of the Proposed Transaction without complying with their duty under state law to maximize shareholder value and the federal securities laws and state law to provide shareholders with all material information about the sales process, potential and actual conflicts of interest, the merger consideration, and the Company's intrinsic value.

126.    As it stands, the Proposed Transaction does not adequately value Par Pharma shares. Instead, as a direct result of the Board's abandonment of duty, the Proposed Transaction will benefit TPG. Accordingly, in the absence of injunctive relief, shareholders will not be able to make an informed decision about whether to vote in favor of the Proposed Transaction.

127.    In sum, by agreeing to the Proposed Transaction, each of the Defendants has breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or has aided and abetted such breaches. Rather than acting in the best interests of the Company's shareholders, Defendants spent substantial effort tailoring the structural terms of the Proposed

Transaction to aggrandize their own personal interests and to meet the specific needs of TPG, which efforts will eliminate the equity interest of Par Pharma's public shareholders.

128.     In essence, the Proposed Transaction is the product of a hopelessly flawed process that was designed to ensure the merger of Par Pharma with TPG on terms preferential to TPG and Defendants, and detrimental to Plaintiff and Par Pharma's shareholders.  Plaintiff seeks to enjoin the Proposed Transaction.

## COUNT I

### Against the Individual Defendants for
### Breach of Fiduciary Duty

129.     Plaintiff repeats and realleges each allegation set forth herein.

130.     By the acts, transactions and courses of conduct alleged herein, Defendants have violated their fiduciary duties of good faith, loyalty and due care at the expense of Plaintiff and other members of the Class.

131.     As alleged herein, the Individual Defendants have failed to, *inter alia*:

(a)     Apprise themselves of the true value of the Company or the benefits of an alternative transaction by, among other things, considering the merits of such transactions and engaging in a market check or canvas of the industry;

(b)     Ensure that the Proposed Transaction or a competing transaction maximizes shareholder value; and

(c)     Otherwise take the steps necessary to comply with their fiduciary duties.

132.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and will further a process that inhibits the maximization of shareholder value and the disclosure of material information.

133.    In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

(a)    Undertake an appropriate evaluation of Par Pharma's value;

(b)    Adequately evaluate the Proposed Transaction and other potential transactions;

(c)    Enable public shareholders to consider the Proposed Transaction, or any alternate transaction, in a fair and non-coercive manner;

(d)    Refrain from favoring their own interests over those of the Company's public shareholders, to, among other things, ensure that conflicts of interest do not unfairly influence the shareholders' decisions or available options; and

(e)    Disclose all material facts necessary to permit the Company's public shareholders to make an informed decision with respect to the Proposed Transaction or any alternate transaction.

134.    Absent injunctive relief, Plaintiff and the Class will continue to suffer irreparable harm as a result of the Individual Defendants' breaches of fiduciary duty, for which Plaintiff and the Class have no adequate remedy at law.

**COUNT II**

**Against Defendants TPG Parent, Sky Growth, and Acquisition Sub for
Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty.**

135.    Plaintiff repeats and realleges each allegation set forth herein.

136.    Defendants TPG Parent, Sky Growth, and Acquisition Sub are sued herein as aiders and abettors of the breaches of fiduciary duties outlined above by the Individual Defendants, as members of the Board.

137.    TPG Parent, Sky Growth, and Acquisition Sub rendered substantial assistance for such breaches, and were privy to non-public information, which they used to their advantage in pursuing the Proposed Transaction, as a result of their close relationship with Par Pharma.

138.    As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares and will not be able to make an informed decision about whether to vote in favor of the Proposed Transaction.

139.    Absent injunctive relief, Plaintiff and the Class will continue to suffer irreparable harm as result of the Individual Defendants' breaches of fiduciary duty, for which Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants and Par Pharma for
### Violations of §14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

140.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

141.    During the relevant period, the Individual Defendants and Par Pharma disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

142.    The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants and Par Pharma.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets.

143.    In so doing, the Individual Defendants and Par Pharma made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made

not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company, the Individual Defendants and Par Pharma were aware of this information and of their duty to disclose this information in the Proxy.

144. The Individual Defendants and Par Pharma were at least negligent in filing the Proxy with these materially false and misleading statements.

145. The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

146. By reason of the foregoing, the Individual Defendants and Par Pharma have violated §14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

147. Because of the false and misleading statements in the Proxy, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT IV

### Against the Individual Defendants and TPG for Violation of §20(a) of the Exchange Act

148. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

149. The Individual Defendants acted as controlling persons of Par Pharma within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Par Pharma and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

150.     Each of the Individual Defendants and TPG was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

151.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of this document.

152.     TPG also had direct supervisory control over composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

153.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants and TPG were each involved in negotiating, reviewing and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which had input from both the Board and TPG.

154.     By virtue of the foregoing, the Individual Defendants and TPG have violated §20(a) of the Exchange Act.

155.     As set forth above, the Individual Defendants and TPG had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons,

these Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' conduct, Par Pharma's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendants, as follows:

A. Declaring that this action is properly maintainable as a class action;

B. Declaring and decreeing that the Proposed Transaction was entered into in breach of the fiduciary duties of Defendants and is therefore unlawful and unenforceable;

C. Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain the highest possible value for shareholders;

D. Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of Par Pharma's shareholders and to refrain from entering into any transaction until the process for the sale or merger of the Company is completed and the highest possible value is obtained;

E. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 13, 2012                    PASHMAN STEIN, P.C.
                                           MICHAEL S. STEIN
                                           JOHN T. WHIPPLE
                                           SEAN MACK


                                                  /s/Sean Mack
                                           ─────────────────────────────
                                                  SEAN MACK

                                           Court Plaza South
                                           21 Main Street, Suite 100
                                           Hackensack, NJ  07601
                                           Telephone:  201/488-8200
                                           201/488-5556 (fax)

                                           ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                           MARK S. REICH
                                           CHRISTOPHER M. BARRETT
                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)


                                           ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                           RANDALL J. BARON
                                           DAVID T. WISSBROECKER
                                           EDWARD M. GERGOSIAN
                                           655 West Broadway, Suite 1900
                                           San Diego, CA  92101
                                           Telephone:  619/231-1058
                                           619/231-7423 (fax)


                                           GOLDFARB LLP
                                           HAMILTON LINDLEY
                                           2501 N. Harwood Street, Suite 1801
                                           Dallas, TX 75201
                                           Telephone:  214/583-2233
                                           214/583-2234 (fax)

                                           *Attorneys for Plaintiff*