# Exhibit C

```
BERGEN COUNTY COURTHOUSE
SUPERIOR COURT LAW DIV
BERGEN COUNTY JUSTICE CTR RM 415
HACKENSACK        NJ 07601-7680
                                     TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (201) 527-2600
COURT HOURS
```

```
                    DATE:   AUGUST 17, 2012
                    RE:     FEMIA VS PAR PHARMACEUTICAL COMPANIES
                    DOCKET: BER L -006305 12
```

THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.

THE MANAGING JUDGE ASSIGNED IS:  HON ROBERT C. WILSON

    IF YOU HAVE ANY QUESTIONS, CONTACT TEAM    002
AT: (201) 527-2600.

    IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
    PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:

```
                              ATT: EVAN J SMITH
                              BRODSKY & SMITH LLC
                              1040 KINGS HIGHWAY NORTH
                              SUITE 601
                              CHERRY HILL      NJ 08034
JUBDES1
```

Evan J. Smith, Esquire
Brodsky & Smith, LLC
1040 Kings Highway North, Suite 601
Cherry Hill, NJ 08034
877-534-2590

*Attorneys for Plaintiff Femia*

SUPERIOR COURT BERGEN COUNTY
**FILED**

AUG 1 4 2012

DEPUTY CLERK

---

ROBERT FEMIA, on behalf of himself and all
others similarly situated,

                    Plaintiff,

    - against -

PAR PHARMACEUTICAL COMPANIES,
INC., TPG CAPITAL, L.P., PATRICK G.
LEPORE, JOSEPH E. SMITH, PETER S.
KNIGHT, RONALD M. NORDMANN,
THOMAS P. RICE, MELVIN SHAROKY,
PATRICK J. ZENNER, SKY GROWTH
HOLDINGS CORPORATION, and SKY
GROWTH ACQUISITION CORPORATION,

                    Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: BERGEN COUNTY

Docket No.: L 6305 -12

**CLASS ACTION COMPLAINT**



Plaintiff, Robert Femia, by his attorneys, alleges the following upon information and belief except for those allegations which pertain to plaintiff, which allegations are based upon personal knowledge:

## INTRODUCTION

1.    Plaintiff brings this action on behalf of himself and all other public shareholders of Par Pharmaceutical Companies, Inc. ("PRX" or the "Company"), who are threatened with the deprivation of the value of their shares of PRX common stock.

2.    This action seeks, *inter alia*, to enjoin PRX's Board of Directors (the "Board") from consummating a proposed merger (the "Proposed Transaction" or the "Merger") with TPG Capital, L.P. ("TPG"). The Proposed Transaction was announced on July 16, 2012 and, as presently constituted, would provide PRX's public shareholders with grossly inadequate



1

consideration of $50.00 in cash for each PRX share they hold (the "Merger consideration"), and is the result of a flawed sales process improperly favoring the current buyer over other potential acquirers, in breach of the Individual Defendants' (defined below) fiduciary duties. Plaintiff also seeks rescission, rescissory damages, or compensatory damages in the event the Proposed Transaction is consummated.

## THE PARTIES

3.     Plaintiff Robert Femia is, and at all relevant times has been, the owner of over 10,000 shares of PRX common stock.

4.     PRX is a Delaware corporation headquartered at 300 Tice Boulevard, Woodcliff Lake, New Jersey 07677. PRX is a U.S.-based specialty pharmaceutical company. Through its wholly-owned subsidiary's two operating divisions, Par Pharmaceutical and Strativa Pharmaceuticals, PRX develops, manufactures, and markets high-barrier-to-entry generic drugs and niche, innovative proprietary pharmaceuticals. PRX's common stock is, and at all times relevant hereto was, listed and traded on the NYSE under the symbol "PRX".

5.     Defendant TPG is a Delaware corporation and a leading global private investment firm founded in 1992 with $51.5 billion of assets under management. TPG has extensive experience with global public and private investments executed through leveraged buyouts, recapitalizations, spinouts, growth investments, joint ventures and restructurings.

6.     Defendant Sky Growth Holding Corporation ("Sky") is a Delaware corporation beneficially owned by an affiliate of TPG.

7.     Defendant Sky Growth Acquisition Corporation ("Merger Sub") is a Delaware corporation that is a wholly-owned subsidiary of Sky and is being used to facilitate the Proposed Transaction.

8.     Defendant Patrick G. LePore ("LePore") has served as the Company's Chief Executive Officer since 2006 and as Chairman of PRX's board of directors (the "Board") since

2007. LePore is a member of the Board's Corporate Development Review Committee.

9.      Defendant Joseph E. Smith ("Smith") has served as a Company director since 2004.  Smith is a member of the Board's Corporate Development Review Committee and Compensation and Management Development Committee.

10.     Defendant Peter S. Knight ("Knight") has served as a Company director since 2001.  Knight is a member of the Board's Audit Committee and Nominating-Corporate Governance Committee.

11.     Defendant Ronald M. Nordmann ("Nordmann") has served as a Company director since 2001. Nordmann is a member of the Board's Audit Committee and Nominating-Corporate Governance Committee.

12.     Defendant Thomas P. Rice ("Rice") has served as a Company director since 2009. Rice is a member of the Board's Audit Committee and Nominating-Corporate Governance Committee.

13.     Defendant Melvin Sharoky ("Sharoky") has served as a Company director since 2007.  Sharoky is member of the Board's Corporate Development Review Committee and Compensation and Management Development Committee.

14.     Defendant Patrick J. Zenner ("Zenner") has served as a Company director since 2010.  Zenner is member of the Board's Corporate Development Review Committee and Compensation and Management Development Committee.

15.     The Defendants identified in paragraphs 5-7 are collectively referred to herein as the "TPG Defendants."  The Defendants identified in paragraphs 8-14 are collectively referred to herein as the "Individual Defendants."  By reason of their positions as officers and/or directors of the Company, the Individual Defendants are in a fiduciary relationship with plaintiff and the other public shareholders of PRX, and owe plaintiff and PRX's other shareholders the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure.  The

Individual Defendants, PRX and the TPG Defendants are collectively referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action, pursuant to Delaware Court of Chancery Rule 23, on behalf of all public shareholders of the Company (except the Defendants herein and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants) and their successors in interest, who are or will be threatened with injury arising from Defendants' actions as more fully described herein (the "Class").

17.     This action is properly maintainable as a class action for the following reasons:

(a)     the Class is so numerous that joinder of all members is impracticable. There are approximately 36 million shares of PRX common stock outstanding, thousands of which are publicly held and actively traded.  The holders of these shares are geographically dispersed throughout the United States.

(b)     there are questions of law and fact which are common to members of the Class, including, *inter alia*, the following:

(i)     whether the Individual Defendants have breached their fiduciary duties owed to plaintiff and the other members of the Class, including their duties of loyalty, due care, and candor;

(ii)     whether the Individual Defendants have breached their fiduciary duties to secure and obtain the best price reasonable under the circumstances for the sale of the Company;

(iii)     whether the TPG Defendants have aided and abetted the Individual Defendants' breaches of fiduciary duties;

(iv)     whether Defendants have disclosed all material facts in connection with the Proposed Transaction; and

(v)   whether plaintiff and the other members of the Class would be irreparably damaged were Defendants not enjoined from the conduct complained of herein;

(c)   the claims of plaintiff are typical of the claims of the other members of the Class, and plaintiff has no interests that are adverse or antagonistic to the interests of the Class; and

(d)   plaintiff is committed to prosecuting this action and has retained counsel competent and experienced in litigation of this nature.  Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

18.   The Individual Defendants have acted in a manner which affects plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

19.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

### Background

20.   PRX is a holding company engaged in the business of developing, licensing, manufacturing, marketing and distributing generic and branded drugs.  The Company operates in two business segments: Par Pharmaceutical, its generic products division; and Strativa Pharmaceuticals, its branded products division.   The products the Company markets are principally in the solid oral dosage form such as tablet, caplet and two-piece hard-shell capsule.  The Company also distributes several oral suspension products, nasal spray products, products

delivered by injection, products in the semi-solid form of a cream and a transdermal patch.

21.    On May 8, 2012, PRX issued a press release announcing its 2012 fourth quarter financial results.   The Company reported earnings 9.6% higher than analysts' consensus estimates.  It also reported total revenue of $271.5 million during Q1 2012, which represented the continuation of a multi-quarter revenue growth trend (a revenue increase of 7 percent over the prior quarter (Q4 2011) and 26 percent over the quarter prior to that (Q3 2011)).  In this regard, the Company reported increased sales of nearly all of its "key products" between Q4 2011 and Q1 2012.  The Company also reported an adjusted gross margin of $110.7 million during Q1 2012, a 6.7 percent increase over that of the prior quarter.

22.    The press release further discussed the Company's recent acquisition of Edict Pharmaceuticals Private Limited ("Edict"), an India-based developer and manufacturer of generic pharmaceuticals, as well as its entry into an exclusive acquisition and license agreement with Handa Pharmaceuticals LLC ("Handa"), giving PRX the exclusive rights to market, sell and distribute dexlansoprazole capsules in the U.S. under Handa's Abbreviated New Drug Application ("ANDA").  Also, the Company stated that it currently had approximately 71 ANDAs pending with the FDA, 21 of which it believed to be first-to-file opportunities, which is significant in that the first-to-file a certified ANDA retains the exclusive marketing rights to the product for a set period of time.

23.    Furthermore, on May 8, 2012, following the announcement of its Q1 2012 financial results, the Company held an earnings conference call.  During the call, Defendant LePore expressed his enthusiasm at the Company's positive earnings to start the year, touted the Company's successful recent pharmaceutical company and product (via ANDA) acquisitions, and expressed his belief that the positive results would continue into the future:

> I am pleased to report to our investors that *2012 is off to a very, very good start* with first quarter performance resulting in cash earnings per share of $0.80. Significant takeaways from the quarter are as follows.  This quarter reflected the new Par Pharmaceuticals inclusive of *Anchen* [Incorporated ("Anchen")] and

*Edict* from both a commercial and development standpoint. And I'm proud to say that we have had filings, ANDA filings, from all three of our development teams, putting us ahead of pace toward our goal of 13 to 17 filings per year. It is significant to note that as expected, our first quarter results included no new product launches, a testament to the strength of our portfolio and to our core strategy of identifying, developing and commercializing products which have market longevity. ***And that certainly bodes well for the rest of the year*** as we anticipate 10 to 14 product launches from April through December.

Another highlight of the quarter and emblematic of one of our ongoing core strategies was the announcement of the ***Handa*** deal, in which we acquire the rights to market generic Dexilant, adding yet another first-to-file to our pipeline. ***I'll point out that our business development team continues to be extremely active and that the deal flow is very, very strong.***

Similarly, we recently launched Provigil, one of the products we acquired from ***Teva*** [Pharmaceuticals] last year in conjunction with our acquisition of Cephalon. Working with companies as divestitures become necessary is also central to our strategy and you can expect us to always be in the running as these opportunities arise.

*   *   *

***Just another great quarter overall and as I said a great start to the year.***

(Emphasis added.)

24.   The day prior to the Q1 2012 earnings announcement, on May 7, 2012, PRX's largest shareholder and the holder of 9.9 percent of its common stock outstanding, Relational Investors, LLC ("Relational"), filed a Form SC 13D/A with the SEC. In its 13D/A filing, Relational stated that it had acquired its PRX's shares because it believed such shares were "undervalued by the market." On two separate occasions, in November 2011 and April 2012, Relational made its concerns about PRX's stock price "undervaluation" known to PRX's management team, including its CEO.

25.   According to Relational, despite the fact that PRX's management had taken steps to improve the value of PRX's shares and had positioned PRX "to generate sustainable earnings growth beyond 2012," "over time [PRX's shares] [would] continue to sell for a substantial discount to the value available in *a strategic sale to a larger company with similar products*." (Emphasis added.) Relational explained the benefits it believed a strategic sale would provide the Company, over and above management's stand-alone improvement strategies, as follows:

7

> [Relational] believe[s] that improved value may very well be achieved in the near term if management continues its work to improve the Company's operations, but [it] also believe that the potential premium available from a strategic buyer should form the backdrop of strategic planning and related decisions made by the Company's board of directors. ***Specifically, [Relational is] confident that substantial cost savings could be achieved in a transaction with a strategic buyer. These synergies would flow from the scale benefits inherent in leveraging a single low-cost manufacturing, sales, and distribution network over the resulting larger asset base. [Relational] believe[s] these potential synergies would allow a strategic buyer to justify a significant premium price over recent trading values. [Relational] believe[s] that this opportunity presents a high hurdle against which stand-alone strategies must be measured.***

(Emphasis added.)

### The Proposed Transaction

26.    On July 16, 2012, PRX and TPG issued a joint press release announcing the Proposed Transaction, which stated as follows:

> **Woodcliff Lake, N.J., July 16, 2012** – Par Pharmaceutical Companies, Inc. (NYSE:PRX) announced today that it has entered into a definitive merger agreement to be acquired by an affiliate of TPG in a transaction with an equity value of $1.9 billion.
>
> Under the terms of the agreement, Par shareholders will receive $50.00 in cash for each share of Par common stock, representing a premium of approximately 37% over the closing share price on July 13, 2012, the last full trading day before today's announcement. The agreement was unanimously approved by Par's Board of Directors.
>
> Patrick G. LePore, Par's Chairman and CEO, stated, "We are excited about this transaction as it delivers compelling value to our shareholders." Mr. LePore continued, "While my focus and that of the Par Board of Directors was on shareholder value, we are very pleased that Par will be acquired by TPG, a leading global private investment firm whose substantial resources and healthcare experience will enable Par to continue to invest in its future long-term growth."
>
> "We are excited for the opportunity to invest in Par, a leading generic pharmaceutical company that has a long track record of success via its focus on complex products and its strong, diversified product pipeline," said Todd B. Sisitsky, partner at TPG. "The company is positioned to benefit from the strong macro trends of a greater focus on cost effective healthcare solutions and the increasing demands from an aging population. We look forward to partnering with this talented management team to continue developing an attractive platform for expansion."
>
> The closing of the transaction is conditioned upon, among other things, the affirmative vote of the holders of a majority of Par's outstanding shares, clearance

8

under the Hart-Scott-Rodino (HSR) Antitrust Improvements Act of 1976, and other customary closing conditions. The transaction is not subject to a financing condition.

Under the terms of the merger agreement, Par may solicit superior proposals from third parties through August 24, 2012. The Par Board of Directors, with the assistance of its advisors, will actively solicit acquisition proposals during this period. There are no guarantees that this process will result in a superior proposal. If there is no superior proposal, the transaction is expected to close in 2012, subject to customary approvals and closing conditions. Par and the Board of Directors do not intend to disclose developments with respect to the solicitation process unless and until the Board of Directors has made a decision.

J.P.Morgan Securities LLC acted as exclusive financial advisor to Par, and Orrick, Herrington & Sutcliffe LLP acted as Par's legal advisor. Cravath, Swaine & Moore LLP acted as independent legal counsel to Par's Board of Directors. Bank of America Merrill Lynch, Deutsche Bank Securities Inc. and Goldman, Sachs & Co. and affiliates acted as financial advisors and provided fully committed financing to TPG. Ropes & Gray LLP acted as legal advisor to TPG.

27.     Notably, despite the fact that PRX had apparently acted on part of Relational's recommendation – to achieve improved value through a sale – it did so not through a sale to a "strategic buyer," such as a "larger company with similar products" that would provide the "synergies" and "scale benefits" Relational had identified, but rather through a sale to a "financial buyer" that lacked the industry presence and knowledge Relational viewed as critical for PRX's sale partner to have.  However, selling to a financial buyer would provide significant benefits to PRX's management, including Defendant LePore, who would retain their management positions and likely receive lucrative financial benefits.

**Inadequate Merger Consideration**

28.     Immediately following the announcement of the Proposed Transaction, several analysts opined that the Merger consideration was well below PRX's market and intrinsic value.

29.     For example, Ami Fadia, an analyst at UBS, stated that she expected that strategic buyers looking for synergies, such as a foreign generic drug company that was looking to expand into the United States market, could offer PRX shareholders market prices in the $60 range in exchange for their shares.  Fadia also raised her 12-month price target on PRX's stock to $58,

well above TPG's offer price. "We believe that this business can easily generate cash flows of about $200 million to $250 million a year, which we value at closer to $60 a share in the hands of a strategic buyer who would be able to drive synergies."

30.     Kevin Kedra, an analyst at Gabelli & Company, valued PRX even higher, at $67 per share, and also predicted that strategic buyers would have an interest in PRX. "Likely buyers would probably be a specialty pharmaceutical company or an international company – maybe a European company that's looking to make a big move into the U.S." Similarly, TheStreet Ratings raised its 12-month price target on PRX's stock to $62.66 per share.

31.     One analyst from The Buckingham Research Group noted that although historical EV/EBITDA multiples for acquisitions of generic drug companies are in the 8-13x range, the EV/EBITDA multiple for the Proposed Transaction was only ~7x, below the historical range. Similarly, an analyst from Gabelli & Company noted that although EBITDA multiples for recent acquisitions of U.S. generic drug companies have been in the 10-12x range, the ~7x multiple for the Proposed Transaction was significantly below this range.

32.     Other analysts had previously placed price targets for the Company's stock well in excess of the $50 per share Merger consideration. These valuations were based, in part, on the Company's recent history of reporting increasingly positive financial results and its recent strategic acquisitions that had significantly increased the scope of its global market reach and the size of its cache of new generic drug applications. These included the Edict and Anchen acquisitions, and the product sales exclusivity agreements (via ANDAs) entered into with Handa and Teva (all mentioned above).

33.     Even PRX's financial analyst, J.P. Morgan, which had significant and potentially conflicting ties to TPG (see discussion below), identified valuation ranges from similar transactions that were, on average, far above the valuation ranges that J.P. Morgan applied when calculating PRX's value. *See* August 2, 2012 Preliminary Proxy ("Proxy") at 40-42 and

discussion in the "material misstatements and omissions" section below.

34.    In addition to the fact that the Merger consideration is well-below analyst's estimates for PRX's stock price value, it fails to compensate PRX's shareholders for the value of their continuing interest in the Company's operations that they will be giving up in the Merger. As discussed above, the Company is performing well and is poised for growth. Even Defendant LePore, PRX's CEO, expressed as much following the Merger announcement, stating that the Board was "very pleased" that TPG's acquisition of PRX "will enable [PRX] to continue to invest in its future long-term growth." PRX's current shareholders will not, however, be able to enjoy such future long-term growth, and they are not being adequately compensated for this.

35.    Thus, the Merger consideration to be paid to Class members is unconscionable and unfair and so grossly inadequate as to constitute a gross breach of trust committed by the Individual Defendants against the public shareholders.

**The Flawed Process By Which PRX Was Shopped**

36.    The Individual Defendants allowed J.P. Morgan Securities LLC ("J.P. Morgan") to act as PRX's exclusive financial advisor in the Merger. J.P. Morgan's recent history acting as a financial advisor and/or financier to TPG in several of TPG's other private equity takeovers and in several of TPG's other business transactions (such as planned IPOs for certain of its subsidiaries) raises significant doubts about J.P. Morgan's ability to provide PRX's Board with impartial analysis and advice regarding the fairness of TPG's Merger offer.

37.    Such recent transactions include: (1) the planned $1 billion IPO of Avaya Holdings Corp., an entity owned by TPG and Silver Lake, which J.P. Morgan is co-leading (announced on February 16, 2012); (2) the $1.25 billion private placement of the 8-year bonds of Caesars Entertainment Corporation, an entity owned by TPG and Apollo Global Management, which J.P. Morgan is co-leading (the sale took place on February 9, 2012); (3) the failed $800 million acquisition by TPG of GlobeOP Financial Services SA, in which J.P. Morgan advised

TPG (announced on February 2, 2012); (4) the $1.7 billion acquisition by TPG of Immucor, in which J.P. Morgan advised TPG and committed financing to the deal (announced on July 5, 2011); (5) the $780 million IPO of Freescale Semiconductor Holdings, an entity owned by a consortium of private equity firms, including TPG, which J.P. Morgan co-led (the IPO took place on May 25, 2011); (6) the $2.1 billion sale of Mey Icki, an entity owned by TPG, to Diageo, in which J.P. Morgan was TPG's financial advisor (sale announced on February 21, 2011); (7) the $300 million debt sale by Energy Future Holdings, an entity owned by TPG and KKR, which J.P. Morgan co-managed (sale announced on October 14, 2010); (8) the $900 million acquisition by TPG, along with ACON Investments, of most of Marathon Oil's assets, in which J.P. Morgan was an advisor to TPG (announced on October 6, 2010); and (9) the $600 million IPO of LPL Investment Holdings, an entity owned by TPG and Hellman & Friedman, which J.P. Morgan underwrote (the IPO took place on June 4, 2010).

38.     J.P. Morgan's conflicts appear to have affected the entire pre-Merger negotiation process between PRX and potential suitors.  For example, J.P. Morgan influenced the Board to forgo a full-fledged market check and instead conduct a "limited auction process" that lasted "several weeks" and included only some strategic buyers and private equity firms, rather than a fully inclusive sales process. *See* The New York Times, *TPG to Buy Par Pharmaceutical for $1.9 Billion*, Dealbook, July 16, 2012.

39.     According to the Proxy, at the start of the process to search for strategic alternatives, the Company's senior management worked with J.P. Morgan "to identify parties that were likely interested in and capable of consummating a Potential Transaction, and to solicit confidential, non-binding preliminary indications of such parties' interest with respect to the Potential Transaction." Proxy at 25.

40.     Almost immediately, J.P. Morgan "determined that approaching *a limited number of the most likely potential acquirers was the optimal way to proceed.*" *Id.* (emphasis added).

Thus, on April 9 and 10, 2010, J.P. Morgan contacted a mere *five* parties, including three potential strategic buyers and two potential financial buyers, to determine their interest in pursuing a potential transaction with PRX. *Id.* Not surprisingly, given J.P. Morgan's extensive history working with and making money from TPG, one of the five parties J.P. Morgan chose to contact was TPG. *Id.* Of those initial five potentially interested parties, only three expressed interest, including only a single potential strategic buyer (of the kind suggested by Relational) and two potential financial buyers, one of which was TPG. *Id.*

41.     In addition, J.P. Morgan did not inform the Board that it had identified *nine* additional potentially interested parties that could be contacted (but were not) – including seven additional strategic buyers and two additional financial buyers – until after negotiations with the initial three interested parties were well underway. Specifically, by the time the Board was made aware of the nine additional parties, the three parties initially contacted had already met with Company management to discuss PRX's business, results of operations, financial condition and prospects; reviewed management's projections for the Company's performance for the next five years; and submitted preliminary non-binding indications of interest with specific price ranges. *Id.* at 25-26. When, on May 17, 2012, J.P. Morgan finally informed the Board of the existence of the nine additional potentially interested parties and the Board asked whether the process should be expanded to include such parties, J.P. Morgan responded that it was not necessary, because "the parties already contacted were likely the most interested qualified candidates." *Id.* at 26. Those nine parties were *never contacted*.

42.     Even among the three interested parties J.P. Morgan initially contacted, J.P. Morgan appeared to favor TPG. Early on in the negotiation process, J.P. Morgan told the Board that TPG's preliminary non-binding bid to acquire PRX for $53.00 to $55.00 per share was "at or near the top of the valuation ranges" it had created for the Company in its valuation analysis. *Id.* (While J.P. Morgan gave this assessment to all three competing offers it received, because TPG's

was the highest, it really was "at the top" of the range.)  However, as discussed below, the valuation ranges J.P. Morgan applied when valuing PRX were significantly below the ranges found in comparable and historically precedential transactions. *Id.* at 40-41.  This made TPG's offer appear to provide more value to PRX shareholders than it really did, which could have improperly influenced that Board to favor TPG during the rest of the negotiation process and in its ultimate decision to accept TPG's lower final offer at $50.00 per share. *See id.* at 29.

## Preclusive Deal Protections

43.     On July 16, 2012, PRX filed a Form 8-K with the SEC that discloses the terms of its Agreement and Plan of Merger with TPG (the "Merger Agreement").  The Merger Agreement contains a number of deal protection devices that will serve to ensure that no alternative buyer offering a superior offer to TPG's will materialize.

44.     For example, the Merger Agreement includes a limited 40-day "go-shop" period for the Company to attempt to find an alternative buyer to make a superior offer. *See* §7.6(a). This period is far too short to allow such a buyer to properly vet the Company and submit a superior offer, especially a company in the pharmaceutical industry with numerous new drug applications pending before the FDA.  Once the limited "go-shop" period expires, PRX is prohibited from soliciting potential superior offers, as per the Merger Agreement's "no-shop" clause. *See* §7.6(b).  In addition, even if the Company does enter into discussions with alternative buyer(s) during the "go-shop" period, it is required to disclose non-public information about the competing bids to TPG, thus allowing TPG to make a topping offer. *See* §7.6(c).

45.     Moreover, if a superior offer does materialize and is accepted during the limited "go-shop" period, PRX must pay TPG a "Termination Fee" of $24 million and cover its expenses up to $7 million. *See* §9.3(a), (c).  If the superior offer materializes during the limited "go-shop" period but is not accepted until after the period expires, the termination fee increases to $48 million, not including expenses. *See id.*

46.     The Merger Agreement's deal protective devices makes it exceedingly unlikely that a competing offer will emerge, despite the inadequate consideration for PRX's shareholders contained in the Merger.  Even if alternative bidders making competing superior offers emerge, such bidders will be at a disadvantage as compared to the TPG Defendants and, accordingly, any post-Merger Agreement market check will be rendered effectively meaningless.  Accordingly, by approving the Merger Agreement with these deal protection devices, the Individual Defendants have breached their fiduciary duties to PRX's shareholders.

**The Preliminary Proxy Contains Material Misstatements and Omissions**

47.     On August 2, 2012, PRX filed a preliminary proxy statement on Form 14A with the SEC (previously defined as the "Proxy") which contains a description of the background and terms and conditions of the Proposed Transaction, as well as the financial analyses and opinions of the Company's financial advisor:  J.P. Morgan.  As described below, the Proxy omits material information and/or provides PRX's shareholders with materially misleading information about the Proposed Transaction that needs to be disclosed in order to enable PRX's shareholders to make a fully informed vote on the Merger.  For example, the Proxy fails to provide a full and fair account of the negotiation process undertaken by defendants leading to the Proposed Transaction and fails to provide a full and fair account of the work undertaken by the Company's financial advisor.  This omitted information, if disclosed, would significantly alter the total mix of information available to PRX's shareholders.

48.     The material omissions from/misleading statements in the Proxy are as follows:

(a)     While the Proxy mentions that, towards the end of the PRX sales process, the Board (through J.P. Morgan) informed Party A that it was still interested in a deal, but that Party A would need to revise its proposal before the Company would be willing to negotiate further with Party A, the Proxy fails to disclose whether Party A ever submitted such a revised

proposal and, if so, what it was and whether and how the Board evaluated it before accepting TPG's offer. (Proxy at 30.)

      (b)    The Proxy fails to disclose (at 40-41): a) the mean/median ranges for the six public companies' financial metrics listed in J.P. Morgan's "Public Trading Multiples" analysis; and b) the basis for J.P. Morgan's applied reference ranges of multiples to value PRX that were below the mean/median ranges of the six public companies selected in that analysis. The failure to disclose the basis for J.P. Morgan's applied reference ranges of multiples to value PRX is material because, by selecting applied reference ranges of multiples to value PRX below the mean/median ranges of the six (6) public companies it selected as comparable, J.P. Morgan artificially lowered the range of implied value for PRX using EBITDA and EPS estimates. In other words, had J.P. Morgan used the mean/median ranges of its selected comparable companies, the valuations for PRX would have been higher.

      (c)    The Proxy fails to disclose: a) the mean/median ranges for the seven (7) transactions J.P. Morgan looked at as part of its Selected Transactions Analysis; and b) how the basis for J.P. Morgan's selection of a FV/LTM EBITDA multiple range of 7.0x to 9.0x to the Company's estimated EBITDA for the twelve-month period ended June 30, 2012, could stem from the "results" of its Selected Transactions Analysis "and other factors that J.P. Morgan considered appropriate" (at 41), when the mean/median ranges of the Selected Transactions Analysis indicates a significantly higher FV/LTM EBITDA multiple range of 8.8x-10.6x. (*Id.*) The failure to disclose the mean/median ranges is material because, had those numbers been disclosed, the fact that J.P. Morgan applied a lower FV/LTM EBITDA multiple range to the Company's estimated EBITDA for the twelve-month period ended June 30, 2012, than the mean/median ranges for the seven selected transactions would be revealed. In other words, had J.P. Morgan used the mean/median ranges of its selected transactions, the valuations for PRX would have been higher. The implied value using J.P. Morgan's selected range was $41-$53.50

per PRX share.  At the mean/median range of its Selected Transactions Analysis the implied value of each PRX share is $53-$64 per share, a material difference.

(d)      Furthermore, the Proxy fails to disclose any of the "other factors that J.P. Morgan considered appropriate" in selecting a FV/LTM EBITDA multiple range of 7.0x to 9.0x to the Company's EBITDA for the twelve-month period ended June 30, 2012 (at 41) in its Selected Transactions Analysis.  This is material because the Selected Transactions Analysis which the Proxy claims provided part of the basis of this range (at 41), does not support that range as discussed in the prior sub-paragraph.

(e)      In its Discounted Cash Flow Analysis ("DCF analysis"), J.P. Morgan calculated the terminal value using perpetuity growth rates beyond the forecast period of 0% - 1%.  The Proxy does not provide an explanation for the rationale used to determine that, beyond the forecast period, PRX will achieve either no, or minimal growth, in free cash flow.  This decision has a significant impact on valuation, because the terminal value portion of the DCF accounts for more than half of the implied value of the Company.  One way to assess the reasonableness of the growth rate is to calculate the implied terminal value EBITDA multiple that corresponds with the 0-1% growth rate.  J.P. Morgan did not provide such a comparison. Absent this disclosure, it would be difficult for shareholders to make an assessment as to the reasonableness of the values computed in the DCF analysis.

(f)      The Proxy also fails to disclose Free Cash Flow projections that J.P. Morgan used in its DCF analysis (at 41-42).

49.      Plaintiff and other members of the Class have no adequate remedy at law.

## COUNT I

### CLASS CLAIM FOR BREACH OF FIDUCIARY DUTIES
### (Against the Individual Defendants)

50.      Plaintiff repeats and realleges the foregoing allegations, as if fully set forth herein.

51.      In agreeing to the Merger, the Individual Defendants and TPG have initiated a

process to merge PRX with TPG in a transaction that will deprive PRX shareholders of their equity interest in the Company for grossly inadequate consideration.   This sale transaction imposes a heightened fiduciary responsibility on the Individual Defendants and requires enhanced scrutiny by the Court.   The Individual Defendants owe fundamental fiduciary obligations to the Company's shareholders to take all necessary and appropriate steps to maximize the value of their shares in implementing such a sale transaction.

52.   As alleged above, the Individual Defendants have violated their fiduciary duties owed to plaintiff and the other Class members by approving an unfair deal, by not allowing the Company to be appropriately shopped, by not offering PRX shareholders adequate Merger consideration, and by not disclosing material information necessary to allow PRX shareholders to make an informed decision about whether to vote their shares in favor of the Merger.

53.   Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiff and the Class, and may consummate the Merger, which will deny Class members their ability to share in PRX's future growth to the irreparable harm of the Class.

## COUNT II

### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
### (Against the TPG Defendants)

54.   Plaintiff repeats and realleges the foregoing allegations, as if fully set forth herein.

55.   The TPG Defendants, by reason of their status as parties to the Merger Agreement, and their possession of non-public information, have knowingly aided and abetted the Individual Defendants in the aforesaid breach of their fiduciary duties.

56.   Such breaches of fiduciary duties could not, and would not, have occurred but for the conduct of the TPG Defendants' breaches of their fiduciary duties owed to plaintiff and the members of the Class.

57.   Unless the TPG Defendants' conduct is enjoined by the Court, they will continue

18

to aid and abet the Individual Defendants' breaches of their fiduciary duties owed to plaintiff and the other members of the Class.

58.     Absent injunctive relief, plaintiff and the Class will continue to suffer irreparable harm as a result of the Individual Defendants' breaches of fiduciary duty, for which plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, plaintiff demands judgment against Defendants, jointly and severally, as follows:

A.      Declaring this action to be a class action and certifying plaintiff as the Class representative and plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining Defendants and all those acting in concert with them from taking any steps to consummate the Proposed Transaction;

C.      Ordering the Defendants to carry out their fiduciary duties to plaintiff and the other members of the Class by announcing their intention to:

(i)     cooperate fully with any person or entity having a bona fide interest in proposing a transaction that would maximize shareholder value, including, but not limited to, a buyout or takeover of the Company;

(ii)    undertake an appropriate valuation of PRX's worth as a merger/acquisition candidate;

D.      If the Proposed Transaction is consummated, directing Defendants, jointly and severally, to account to plaintiff and the Class for all damages suffered as a result of the wrongs complained of herein;

E       Awarding plaintiff the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of plaintiff's attorneys and experts; and

F.      Granting such other and further relief as the Court may deem just

and proper.

Dated:  August 13, 2012

BRODSKY & SMITH, LLC

By:

Evan J. Smith
Marc L. Ackerman
1040 Kings Highway N., Suite 601
Cherry Hill, NJ 08034
(856) 795-7250

*Attorneys for Plaintiff*

**Of Counsel:**

**WOLF POPPER LLP**
Chet Waldman
845 Third Avenue
New York, New York 10022
(212) 759-4600

**Appendix XII-B1**

<table>
<tr><td colspan="2" rowspan="2">

**CIVIL CASE INFORMATION STATEMENT**
(CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
**Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed**
</td><td colspan="2">

FOR USE BY CLERK'S OFFICE ONLY

PAYMENT TYPE: ☐CK ☐CG ☐CA

CHG/CK NO.

AMOUNT:

OVERPAYMENT:

BATCH NUMBER:
</td></tr>
</table>

| ATTORNEY / PRO SE NAME<br>Evan J. Smith, Esquire | TELEPHONE NUMBER<br>(877) 534-2590 | COUNTY OF VENUE<br>Bergen |
|---|---|---|

| FIRM NAME  (if applicable)<br>Brodsky & Smith, LLC | DOCKET NUMBER (when available)<br>L 6305 -12 |
|---|---|

| OFFICE ADDRESS<br>1040 Kingshighway, North, Suite 601<br>Cherry Hill, NJ 08034 | DOCUMENT TYPE<br>Complaint |
|---|---|
| | JURY DEMAND   ■ YES   ☐ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff)<br>Robert Femia | CAPTION<br>Femia v. Par Pharmaceutical Companies, Inc. et al. |
|---|---|

| CASE TYPE NUMBER (See reverse side for listing)<br>508 | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES   ■ NO |
|---|---|
| | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW<br>REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING?<br>☐ Yes   ■ No | IF YES, LIST DOCKET NUMBERS |
|---|---|

| DO YOU ANTICIPATE ADDING ANY PARTIES<br>(arising out of same transaction or occurrence)?<br>☐ Yes   ■ No | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY  (if known)   ☐ NONE<br>☐ UNKNOWN |
|---|---|

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR<br>RECURRENT RELATIONSHIP?<br>☐ Yes   ■ No | IF YES, IS THAT RELATIONSHIP:<br>☐ EMPLOYER/EMPLOYEE   ☐ FRIEND/NEIGHBOR   ☐ OTHER (explain)<br>☐ FAMILIAL   ☐ BUSINESS |
|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?   ■ Yes   ☐ No |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR
ACCELERATED DISPOSITION

A Preliminary Injunction Motion is intended to be filed.

| ♿ | DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?<br>☐ Yes   ■ No | IF YES, PLEASE IDENTIFY THE  REQUESTED ACCOMMODATION |
|---|---|---|
| | WILL AN INTERPRETER BE NEEDED?<br>☐ Yes   ■ No | IF YES, FOR WHAT LANGUAGE? |

**I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be
redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).**

ATTORNEY SIGNATURE:

Effective 05-07-2012, CN 10517-English

**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
### Use for initial pleadings (not motions) under *Rule* 4:5-1

## CASE TYPES (Choose one and enter number of case type in appropriate space on the reverse side.)

### Track I - 150 days' discovery
151 NAME CHANGE
175 FORFEITURE
302 TENANCY
399 REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
502 BOOK ACCOUNT (debt collection matters only)
505 OTHER INSURANCE CLAIM (including declaratory judgment actions)
506 PIP COVERAGE
510 UM or UIM CLAIM (coverage issues only)
511 ACTION ON NEGOTIABLE INSTRUMENT
512 LEMON LAW
801 SUMMARY ACTION
802 OPEN PUBLIC RECORDS ACT (summary action)
999 OTHER (briefly describe nature of action)

### Track II - 300 days' discovery
305 CONSTRUCTION
509 EMPLOYMENT (other than CEPA or LAD)
599 CONTRACT/COMMERCIAL TRANSACTION
603N AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
603Y AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
605 PERSONAL INJURY
610 AUTO NEGLIGENCE – PROPERTY DAMAGE
621 UM or UIM CLAIM (includes bodily injury)
699 TORT – OTHER

### Track III - 450 days' discovery
005 CIVIL RIGHTS
301 CONDEMNATION
602 ASSAULT AND BATTERY
604 MEDICAL MALPRACTICE
606 PRODUCT LIABILITY
607 PROFESSIONAL MALPRACTICE
608 TOXIC TORT
609 DEFAMATION
616 WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
617 INVERSE CONDEMNATION
618 LAW AGAINST DISCRIMINATION (LAD) CASES

### Track IV - Active Case Management by Individual Judge / 450 days' discovery
156 ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
303 MT. LAUREL
508 COMPLEX COMMERCIAL
513 COMPLEX CONSTRUCTION
514 INSURANCE FRAUD
620 FALSE CLAIMS ACT
701 ACTIONS IN LIEU OF PREROGATIVE WRITS

### Centrally Managed Litigation (Track IV)
285 STRYKER TRIDENT HIP IMPLANTS
288 PRUDENTIAL TORT LITIGATION
289 REGLAN
290 POMPTON LAKES ENVIRONMENTAL LITIGATION

291 PELVIC MESH/GYNECARE
292 PELVIC MESH/BARD
293 DEPUY ASR HIP IMPLANT LITIGATION
295 ALLODERM REGENERATIVE TISSUE MATRIX
623 PROPECIA

### Mass Tort (Track IV)
266 HORMONE REPLACEMENT THERAPY (HRT)
271 ACCUTANE/ISOTRETINOIN
274 RISPERDAL/SEROQUEL/ZYPREXA
278 ZOMETA/AREDIA
279 GADOLINIUM

281 BRISTOL-MYERS SQUIBB ENVIRONMENTAL
282 FOSAMAX
284 NUVARING
286 LEVAQUIN
287 YAZ/YASMIN/OCELLA
601 ASBESTOS

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

### Please check off each applicable category   ☒ Putative Class Action   ☐ Title 59